**L. O. KOVEN & BROTHER, INC., a New Jersey Corporation**

v.

**LOCAL UNION NO. 5767, UNITED STEELWORKERS OF AMERICA, AFL–CIO, an Unincorporated Association, Appellant.**

**No. 15917.**

United States Court of Appeals Third Circuit.

Argued Oct. 7, 1966.

Decided May 5, 1967.

As Corrected May 12, 1967.

Abraham L. Friedman, Newark, N. J. (Rothbard, Harris & Oxfeld and Samuel L. Rothbard, Newark, N. J., on the brief), for appellant.

Laurence Reich, Newark, N. J. (Carpenter, Bennett & Morrissey and Thomas E. Walsh, Jr., Newark, N. J., on the brief), for appellee.

Before FORMAN, FREEDMAN, and SEITZ, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

This case involves the question of an employer's duty to arbitrate a grievance where the underlying claim is alleged to have been discharged by an order of confirmation entered in a proceeding under Chapter XI of the Bankruptcy Act[1] and a general release executed by a union. It is here on appeal from an order of the United States District Court for the District of New Jersey, declaring that the union's claim was discharged by operation of law and permanently enjoining the union from submitting the claim to arbitration.

### I—Background

The plaintiff-appellee, L. O. Koven & Brother, Inc. (hereinafter Koven) is the successor by merger to Koven Fabricators, Inc., which entered into a collective bargaining agreement (hereinafter Agreement) on or about June 17, 1960 with the defendant-appellant, Local Union No. 5767, United Steelworkers of America, AFL-CIO (hereinafter Union). The Agreement was to expire by its own terms at midnight, June 17, 1963, but it was extended to midnight June 17, 1965 by a subsequent agreement reached on June 17, 1963. It is unquestioned that Koven was bound by this contract of its predecessor.

On September 4, 1963, Koven filed an original petition for arrangement under Chapter XI of the Bankruptcy Act[2] in the United States District Court for the District of New Jersey. On the same day Bertram J. Latzer was appointed Receiver of Koven and authorized to conduct its business. Kovin subsequently proposed a plan of arrangement in which it offered to pay, *inter alia*, "all priority claims and administration expenses in cash upon * * * confirmation * * or upon such terms or conditions and with such security and on such deferred payments as will be agreed upon [with] this class of creditors. * * *" On January 10, 1964 the Referee entered an order confirming the plan of arrangement as amended and revesting Koven with its assets.

On or about January 8, 1964, the Union filed eight proofs of "priority claims" against Koven in the arrangement proceedings, numbered 453 to 460 by the Referee in Bankruptcy, for various wage-associated amounts due under the Agreement,[3] but not including any claim for vacation pay earned since June 1, 1963.

The Union and Koven, on April 30, 1964, entered into and filed with the Referee in Bankruptcy a "Stipulation of Settlement," whereby it was agreed that "Claims No. 453 through 460, inclusive * * * shall be settled and compromised by the payment to said Union of the sum

---

1. 11 U.S.C. § 701 et seq.

2. 11 U.S.C. § 722.

3. The eight claims so filed included (1) holiday pay for Thanksgiving Day, 1963; (2) time and a half pay for Christmas Day, 1963 and (3) New Year's Day, 1964; (4) a Christmas bonus; (5) a day's pay for employees whose employment was terminated without requisite notice; (6) an arbitrator's award for overtime wages in 1961; (7) another unarbitrated wage claim; and (8) amounts payable to the New Jersey Blue Cross and Blue Shield for the benefit of the employees.

of $7,000.00" to be made by Koven's receiver from the funds then in his hands. This "Stipulation" also provided that upon receipt of said sum, the Union would "execute and deliver a general release" to Koven and its receiver.

On May 18, 1964, the Union in consideration of the sum of $7,000 executed a general release to Koven and its receiver, expressly stating that it was made "in accordance with a Stipulation dated April 30, 1964 and Order of the same date based on said Stipulation, filed in a matter entitled 'In the Matter of L. O. Koven & Brother, Inc. * * * Debtor,' pending in the United States District Court for the District of New Jersey." The release purported to discharge Koven and its receiver:

> "*their successors* and assigns, of and from all manner of action and actions, * * * suits, debts, dues, sums of money, accounts, * * * contracts, controversies, agreements, promises, * * * claims and demands whatsoever in law or in equity, which * * * it ever had, now has or which [it] and assigns hereafter can, shall, or may have, for, upon or by reason of any matter, * * * from the beginning of the world to the day of the date of these Presents, * * * "

specifically excluding, however, an unfair labor practice claim then pending before the National Labor Relations Board, which is not a part of the present suit. The unitalicized portion of the foregoing quotation was in the standardized language of a printed form of release.

Article XVI of the labor Agreement provided in part for the establishment of vacation periods or the equivalent in pay for employees who "have worked one thousand (1000) hours or more during the period from June 1 to June 1 of the preceding year, * * *." [4]

Article XII of the Agreement set forth a grievance procedure applicable to "any difference * * * as to the meaning, compliance with, or application of the provisions of this agreement," the last phase of which required the grievance to be "determined by an arbitrator to be selected by the parties" under the rules of and from a list provided by the American Arbitration Association. A clause added by the June 17, 1963 extension agreement stated that "the decision of the arbitrator shall be final and binding upon the parties."

On or before June 15, 1964, the Union filed with Koven a "Grievance Report" claiming that Koven was in violation of the collective bargaining agreement by its failure to pay vacation benefits to those employees so entitled. Koven and the Union met pursuant to the latter's request on June 29, 1964 to discuss the grievance. At that time, Koven declined to honor the claim on the ground that it was barred by the order of confirmation and general release. On the following day, the Union wrote to the American Arbitration Association requesting an arbitration panel to consider, among other things,[5] the vacation pay grievance.

None of the ten employees represented by the Union had worked 1,000 hours

---

4. "ARTICLE XVI—VACATIONS
   * * *
   "Section 3. The Employer shall grant an annual vacation of one (1) week with pay to employees with one (1) year of service with the Employer, two (2) weeks to employees with five (5) years of service with the Employer, and three (3) weeks to employees with fifteen (15) years of service with the Employer.
   "Section 4. Employees with service of more than one (1) but less than five (5) years shall receive one (1) day's vacation

in addition to one (1) week for each year in service completed over one (1) year's service, up to two weeks' vacation."

5. Two other grievances for which the Union sought arbitration were # 1–64: "Company in violation of the collective bargaining agreement and certification by the National Labor Relations Board, and # 2–64: "Sub-contracting of work." The record does not otherwise indicate the content of these claims nor whether any separate arbitration has proceeded upon them.

between the preceding June 1, 1963 and the date that the Chapter XI petition was filed, September 4, 1963, but by January 10, 1964, when the order confirming the plan was entered, nine employees had accumulated substantially more than 1,000 hours. After the date of confirmation, another employee completed 1,000 hours, and all but one of the nine employees worked additional hours. The last day worked by any of the foregoing employees was February 28, 1964, or about six weeks after the date of confirmation.[6]

On November 17, 1964, Koven commenced this action by verified complaint in the District Court seeking a declaratory judgment that the claims underlying the grievance had been discharged by operation of law and for a permanent injunction barring the Union from presenting its claim to any person or group for arbitration. Jurisdiction was alleged under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 and Section 2 of the Bankruptcy Act, 11 U.S.C. § 11. The Union filed an answer and counterclaim seeking a declaration that it was entitled to have its claim arbitrated. The parties filed an Agreed Statement of Facts relating to the foregoing circumstances of the case.

In granting the prayer of Koven, the District Court held that it had jurisdiction of the parties and subject matter under § 301 of the Labor Management Relations Act;[7] that where the claim sought to be arbitrated has been discharged by law, arbitration must be denied; that it was for the court to decide whether the release and order of confirmation so discharged the claim; that the "necessary effect" of the release was to discharge the claim; and that the vacation pay claim was barred by the order of confirmation.[8]

II—*Proper Forum Where Labor and Bankruptcy Issues Coincide*

██ The problem presented by the instant appeal is not merely the effect of the order of confirmation and the release on the Union's claim for vacation benefits, but also the question of the proper forum—the arbitrator or the court—to decide that effect. The National Labor Relations Act's preference for arbitration,[9] as interpreted by the Supreme Court, confines the function of a court to "ascertaining whether the

6. The Union tabulated the hours worked by each employee as follows:

| Name of Employee | Last Day Worked | Hours Worked 6/1/63 1/10/64 | Hours Worked Jan. 11, 1964 through last day worked. |
|---|---|---|---|
| Harold Ayres | Feb. 19, 1964 | 1157.1 | 221 |
| Joseph Evans, Jr. | Feb. 3, 1964 | 1299.6 | 149.7 |
| Harry Gorman | Jan. 24, 1964 | 1187.5 | 64 |
| John Laggan | Feb. 12, 1964 | 1174 | 168 |
| William Linde | Feb. 14, 1964 | 1222.3 | 188.5 |
| V. G. Mellott | Oct. 25, 1963 | 1067.3 | |
| John Peterson | Feb. 3, 1964 | 1201.5 | 124 |
| Edward Pivornik | Feb. 28, 1964 | 1185.6 | 247 |
| Joseph Protus | Feb. 2, 1964 | 932 | 72 |
| William Stites | Feb. 3, 1964 | 1410.3 | 120 |

7. See Black-Clawson Co., Inc. v. International Ass'n of Machinists, 313 F.2d 179 (2 Cir. 1962). No appeal has been taken by either party from the apparent refusal of the District Court to assume jurisdiction as a bankruptcy court under 11 U.S.C. § 11. See Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230, 93 A.L.R. 195 (1934).

8. 250 F.Supp. 810 (D.N.J.1966).

9. Section 203 of the Taft-Hartley Act, 29 U.S.C. § 173(d).

party seeking arbitration is making a claim which on its face is governed by the contract." [10] "The question is not whether in the mind of the court there is any equity in the claim." [11] This function is further conditioned by a strong presumption in favor of arbitrability, which requires arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." [12]

On the other hand, the boundaries of our power are also measurable by delineating those of the arbitrator, who is "confined to the interpretation and application of the collective bargaining agreement," though he may "look to guidance from many sources". [13] If an award were based "solely on the arbitrator's view of the requirements of enacted legislation," not only would the arbitrator be beyond the area of his expertise, but also beyond "the scope of his submission." [14]

■■ The arbitration clause of the Agreement covers "any difference * * * as to the meaning, compliance with, or application of the provisions" thereof. While the coverage is broad, the raw material of the arbitral process must be the labor contract. Thus, to the extent that the Union's recovery or non-recovery turns on an interpretation of the discharge provisions of the Bankruptcy Act, the question is for a judicial forum. [15] The same conclusion is compelled from another viewpoint: The uniform application and development of federal bankruptcy policy depends on entrusting its operation to a forum which defines issues of fact and law sufficiently to permit review of its decision on the merits. [16] A labor arbitrator, on the other hand, has no obligation to set out the supporting facts or reasons for an award, and it has been pointed out that to allow substantive review of arbitration awards would undermine the federal policy of settling labor disputes. [17]

The appellant, however, argues that since courts are enjoined to refuse to review the merits [18] of an award, and since a discharge is commonly regarded as merely a personal defense on the

10. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 1363, 4 L.Ed.2d 1403 (1963).

11. Id. at 567, 80 S.Ct. 1343, 1346, 1363.

12. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1963).

13. United Steelworkers of America v. Enterprise Wheel & Car Co., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1963).

14. Ibid.

15. "[W]hen the *issue* presented is, on its face, within the contractual agreement to arbitrate, the court shall not interfere." Communications Workers of America v. Bell Telephone Laboratories, 349 F.2d 398, 401 (3 Cir. 1965) (emphasis supplied).

16. "Remitting the bankrupt to the unreviewable decision of an arbitrator on the effect of his discharge is even worse than leaving him to a justice of the peace or city court". Fallick v. Kehr, 369 F.2d 899, 906 (2 Cir. 1966) (Friendly, J., dissenting); see State Fin. Co. v. Morrow, 216 F.2d 676, 680 (10 Cir. 1954). In Fallick v. Kehr, supra, the majority held that the bankruptcy court had not abused its discretion in not preventing a commercial arbitrator from determining whether a debt was a nondischargeable liability for "willful and malicious injury" under 11 U.S.C. § 35(a) (2), the court finding that the question was not "particularly esoteric." That case is readily distinguishable since the contractual submission was for the determination of all matters, not merely labor matters and the party then seeking to prevent arbitration had originally forced his alleged creditor into the arbitral forum.

17. United Steelworkers of America v. Enterprise Wheel & Car Co., 363 U.S. 593, 596–598, 80 S.Ct. 1358 (1963); see Newark Stereotypers' Union v. Newark Morning Ledger Co., 261 F.Supp. 832, 835 (D. N.J.1966).

18. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 1346 (1963).

merits,[19] it follows that the effect of the order of confirmation should be determined by an arbitrator. The fallacy in the appellant's argument is the shifting sense of the word "merits." We are not concerned with rules governing pleading; nor with problems of comity between bankruptcy courts and state courts; the question here involves differences between judicial and arbitral forums and the scope of a labor arbitrator's submission.

■ There are other problems in the present case, however, of a different nature. Thus, for example, we can decide whether vacation benefits constitute "wages" for purposes of Section 17(a) (5) of the Bankruptcy Act, making certain wage debts nondischargeable and the effect of the 1000 hour eligibility provision on this section as matters of bankruptcy law without considering what amounts, if any, are actually due for the period in question as a matter of contract interpretation.[20] This last question would have been decided without hesitation by a court in earlier times when collective bargaining agreements were believed governed by ordinary contract law principles.[21] But recent

Supreme Court decisions caution that the interpretation of a labor contract containing an arbitration clause is a matter involving considerations "foreign to the competence of the courts," involving "sources of law * * * not confined to the express provisions of the contract, as the industrial common law".[22] Our competence to render appropriate judgments on these contract matters is not enhanced because a bankruptcy matter is also involved. Therefore, if it is feasible to separate bankruptcy questions from contractual questions, the former should be decided by a court, and the proceedings stayed pending arbitral determination of the latter.[23]

Another type of problem involved in this case is one which does not necessarily require the interpretation of the Bankruptcy Act, but appears to involve some special bankruptcy interests. Koven cites two cases, In re Muskegon Motor Specialties Co.,[24] and Johnson v. England[25] which present this problem. *Muskegon* involved a Chapter X proceeding; *Johnson* involved ordinary bankruptcy. In both cases the union had demanded arbitration of a claim prior to the institution of the proceed-

19. The appellant cites Dimock v. Revere Copper Co., 117 U.S. 559, 6 S.Ct. 855, 29 L.Ed. 994 (1886); Household Finance Co. v. Dunbar, 262 F.2d 112 (10 Cir. 1958); Grand Union Equipment Co. v. Lippner, 167 F.2d 958 (2 Cir. 1948); In re Innis, 140 F.2d 479 (7 Cir. 1944), which stand for the general proposition that a discharge must be pleaded and proved in the forum where the creditor sues on the debt, and if it is not so pleaded and proved, it is waived as a defense.

20. That is, it can be decided that a matter is open for arbitration because any valid claim for the period in question is not precluded by the Bankruptcy Act without deciding the validity of the claim for vacation pay itself, which "exists, if at all, under the agreement." Local Lodge No. 595, Dist. 152, International Ass'n of Machinists v. Howe Sound Co., 350 F.2d 508, 511 (3 Cir. 1965), and would therefore be a matter of arbitral competence.

21. See e.g., In re Kinney Aluminum Co., 78 F.Supp. 565 (S.D.Cal.1948), holding that the validity of a claim for vacation

pay upon premature termination of employment is governed by California law.

22. United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581–582, 80 S.Ct. 1347, 1352 (1963).

23. A court may delay a judicial determination which is related to but separable from an arbitral determination until the latter has been made, Los Angeles Paper Bag Co. v. Printing Specialties and Paper Products Union, Dist. 2, AFL-CIO, 345 F.2d 757 (9 Cir. 1965), and aid in the formulation of the question for arbitration, if necessary. Socony Vacuum Tanker Men's Ass'n v. Socony Mobil Oil Co., 369 F.2d 480 (2 Cir. 1966).

24. 313 F.2d 841 (6 Cir. 1963), cert. den. sub nom. International Union UAW v. Davis, 375 U.S. 832, 84 S.Ct. 51, 11 L.Ed. 2d 63 (1963).

25. 356 F.2d 44 (9 Cir. 1965), cert. den. sub nom. Johnson v. Raphael Weill & Co., Inc., 384 U.S. 961, 86 S.Ct. 1587, 16 L.Ed.2d 673 (1966).

ings, and sought the right to proceed to arbitration and award dehors the bankruptcy court after the initiation of proceedings despite the bankruptcy court's jurisdiction over the debtor and its property. In both cases an award to the union would have diminished the general fund available to the other creditors; in each case the employer had gone out of business completely; and in each case arbitration was denied, the *Muskegon* court stating that the denial was within the bankruptcy court's discretion,[26] and the *Johnson* court stating that to allow arbitration would be "inappropriate."[27] The court in *Johnson* noted that "A decision of the arbitrator here would involve the interests of parties who never consented to arbitration, namely the trustee in bankruptcy and the general creditors."[28]

■ There are numerous significant differences between *Muskegon, Johnson,* and the present case. Those cases involved either a Chapter X reorganization or ordinary bankruptcy while the present case involves a more flexible Chapter XI arrangement.[29] There is no indication in the present case that Koven is defunct or that labor peace is not at issue[30]—in fact, the receiver here made use of the labor force during the administration period. The crucial difference, however, is that *Muskegon* and *Johnson* involved questions of the amount, existence, and priority of claims to be paid out of a general fund and thus involved the interests of other creditors, while the issue of nondischargeability in the present case principally affects the interest of the debtor Koven, since it turns on the question of what claims "override the value of giving the debtor a wholly fresh start."[31] The conflict is thus reduced to one between the union and the employer, both of whom are bound by the contractual obligation to arbitrate. Therefore, once the court decides questions involving the Bankruptcy Act itself, there is no reason for it to assume the decision of

26. 313 F.2d at 843.

27. 356 F.2d at 52. This different terminology, suggesting a different procedure, can be explained by reference to the nature of the question sought to be arbitrated. In *Muskegon*, the question was a matter of contract interpretation, much the same as here, as to whether the union was entitled to vacation pay where the employer went out of business before the date that the compensation was due. In *Johnson*, the question was whether the failure of the employer to make contribution to a pension fund as required by the contract created a trust in the union's favor—clearly a question of law external to the contract.

28. 356 F.2d at 51.

29. See *Id.* at 49; compare *National Labor Relations Board v. Coal Creek Coal Co.*, 204 F.2d 579 (10 Cir. 1953) cited in Johnson v. England, supra; see also *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L. Ed. 1293 (1940).

30. The appellee states on brief that labor peace is not at issue, that "there is no continuing employer-employee relationship in the case at bar. As an entity employing employees under the collective bargaining agreement with the defendant Union, the plaintiff is no more." This qualified and ambiguous statement seeks to draw support from a record completely undeveloped on this point. The record indicates merely that the last day worked by an employee claiming wages in this controversy and under the present Agreement was February 28, 1964—well after the order of confirmation revesting Koven with its assets. There is no information in the record as to whether the same employees are working under another agreement; whether operations continue with other employees; whether Koven merely shut down one of its plants; or whether it is simply defunct. Furthermore, Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965) strongly suggests that permanent plant shutdown is not cause for refusing arbitration, on the theory that it is necessary for the employer and the union to be able to agree at the negotiating stage on a comprehensive settlement procedure, available in all events.

31. Bruning v. United States, 376 U.S. 358, 361, 84 S.Ct. 906, 908, 11 L.Ed.2d 772 (1964).

non-bankruptcy questions in behalf of other bankruptcy interests.

■ The same problem of a matter which does not itself involve an interpretation of the Bankruptcy Act, but which at least arguably involves bankruptcy interests, arises in somewhat different form with regard to the effect of the release. The release was given in conjunction with the settlement of several "priority claims" which the Union filed in the Chapter XI proceedings. Since these claims were to be satisfied with moneys from the fund in the hands of the receiver, the release ran not only to Koven, but also to the receiver, who, of course, is accountable for expenses incurred during the administration period.[32]

Despite this relationship to the Chapter XI proceedings, we think the release does not involve any legitimate bankruptcy interest which would preempt arbitral determination. The approved plan of arrangement left the settlement of the Union's "priority claims" open-ended to be resolved by future agreement between Koven and the Union— and did not specify or require that a general release be given as a term of such settlement. We must therefore assume that it was not an essential of the arrangement. It is also clear that the interest of the receiver is not involved in the present litigation. The Union is seeking no money from the receiver; no arbitral award could affect the liability of the receiver; no decision by the arbitrator on the meaning of the release could bind the receiver.[33] Finally, it is important to note that no challenge is being made by the Union as to the effect of the release on those claims actually processed in the Chapter XI proceeding and to which the "Stipulation of Settlement" referred. Thus the arrangement itself is unaffected.

■ What remains in this case is the question of whether the effect of the release executed between an employer and a union regarding a claim governed by a collective bargaining agreement is ordinarily a matter for consideration by an arbitrator. There is scant authority on this point, but those cases touching upon this or related questions appear to view the arbitrability of release and settlement questions as obvious.[34] While interpreting the language of the release is not, strictly speaking, a matter of interpreting the collective bargaining contract,[35] the process would also involve an examination of the negotiations and other events regarding the grievance which preceded the execution of the release.[36] This is

---

32. See generally, 5A Remington, Bankruptcy, §§ 2333–2336 (5th ed. 1953).

33. As to the arbitrability of a question in which a third party is involved, see Smith and Jones, The Impact of Emerging Federal Law of Grievance Arbitration on Judges, Arbitrators, and Parties, 52 Va. L.Rev. 831, 863 (1966).

34. See International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, UAW, AFL-CIO v. Daniel Radiator Corp. of Texas, 328 F.2d 614 (5 Cir. 1964) (per curiam) reversing a district court holding that a question was not arbitrable because of alleged settlement; Reif v. Williams Sportswear, Inc., 9 N.Y.2d 387, 214 N.Y. S.2d 395, 174 N.E.2d 492 (N.Y.Ct.App. 1961), holding that whether union had settled grievance by executing general release (and presumably the effect of that release) was a matter for arbitration;

Bakery Drivers Union Local 550, IBT v. Krug Baking Co., 19 A.D.2d 301, 304, 240 N.Y.S.2d 1008 (N.Y.App.Div.1963), holding that such matters as claimed settlements are for arbitrators to decide; see also General Warehousemen and Employees Union No. 636 v. American Hardware Supply Co., 329 F.2d 789 (3 Cir.), cert. den. 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 37 (1964).

35. But cf. Retail Clerks Int'l Ass'n, Local 128 and 633 v. Lion Dry Goods Co., 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962).

36. Inquiry into the circumstances of a contract would also be pertinent notwithstanding legal rules purporting to exclude evidence external to the contract verbiage when the meaning is clear on its face. 4 Williston, Contracts § 600A (3d ed. 1961). Such rules, of course, do not apply in an arbitral forum.

a matter within the arbitrator's submission and to which he is expertly atuned. We thus believe that unless a release explicitly discharges the parties from the collective bargaining agreement itself, or from the arbitration provisions thereof, that its effect should be determined by an arbitral forum.

In holding that the release should be passed upon by the arbitrator, we make no comment on the merits of the issue; the arbitrator may well decide as did the District Court below that the Union completely discharged Koven. We are merely remitting the parties to the forum they agreed to use for the processing of claims under the Agreement.[37]

In summary, we hold that questions involving an interpretation of the Bankruptcy Act should be decided by the court, while questions involving an interpretation of the collective bargaining agreement should if feasible be decided by the arbitrator, unless they involve special bankruptcy interests. If such interests are present, then the proper forum should be dictated by the needs of the particular case, and this is a matter best left with the discretion of the trial court. We find that no such interests are involved in the release issue, and hold therefore that it is arbitrable.

## III—Effect of Chapter XI Proceedings on the Union's Claim

The Union claims vacation benefits accruing between June 1, 1963 and February 28, 1964, the last date on which any employee worked. Thus, for bankruptcy purposes the claim spans three distinct periods: (1) three months and three days preceding the filing of the Petition for Arrangement; (2) approximately four months during the arrangement proceedings; and (3) approximately six weeks after the proceedings. Each of these periods is subject to different legal considerations and will be treated under separate heading.

### A. Period Preceding the Arrangement Proceedings

Section 371 of the Bankruptcy Act,[38] provides in part that the confirmation of an arrangement does not release a debtor from "debts as, under section 35 of this title, are not dischargeable." Section 35(a) (5) of Title 11 U.S.C. specifies as such nondischargeable debts those which "are for wages which have been earned within three months before the commencement of proceedings in bankruptcy due to workmen, servants, clerks * * *." This court recognized in *In re Public Ledger* that "A vacation with pay is in effect additional wages." [39]

Although each employee in the present case has in fact worked the requisite 1000 hours within the period specified in the Agreement, the District Court held that because "claims" in a Chapter XI proceeding are "fixed as of the date of filing the petition" and because on that date no employee had accumulated 1000 hours, then none had "earned" the vacation benefits within the three month period, and therefore the defendant's claim for vacation benefits was discharged by the order of confirmation.[40]

The District Court erred in deciding the present matter in reliance upon language in cases dealing with *claims* for wage priorities under Section 64(a) (2) of the Bankruptcy Act made during the course of ordinary bankruptcy proceedings, while the present case involves a question of *dischargeability* under Section 17(a) (5) of the Act following Chapter XI proceedings. Thus the District Court relied principally upon a dictum from Division of Labor Law Enforcement v. Sampsell,[41] that "If any employee here had not, prior to bank-

---

37. See Drake Bakeries, Inc. v. Local 50, American Bakery and Confectionary Workers Int'l, AFL-CIO, 370 U.S. 254, 266, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962).

38. 11 U.S.C. § 771.

39. 161 F.2d 762, 767 (3 Cir. 1947), quoting In re Wil-low Cafeterias, Inc., 111 F.2d 429, 432 (2 Cir. 1940).

40. 250 F.Supp. at 815.

41. 172 F.2d 400, 402 (9 Cir. 1949).

ruptcy, completed a year's continuous service, no compensation * * * would have been due him, regard being had to the wage agreement," referring to a provision in the employment contract that those employees who had been employed a year or more were to receive a week's vacation with pay. It is important to note that this dictum does not disallow the claim because of any restrictive definition of the word "earned" as used in Section 64(a) (2), but rather explicitly founds its conclusion on an interpretation of the labor contract. More important for present purposes is that the dictum had in mind a claim for wage priority under Section 64(a) (2) during ordinary bankruptcy where business operations would either cease at the date of bankruptcy or would be conducted for a limited period prior to liquidation. Thus it would not ordinarily be possible for an employee who had not already complied with the eligibility provision to do so, or for the court to know from that perspective whether he could have done so. What result we would reach in such a situation [42]—with its attendant forum problems—we need not now consider, for ours is an entirely different case. First, it involves a Chapter XI proceeding where, as is usual, the business was continued through and after the proceedings and thus the employees had an opportunity to comply with the 1000 hour provision. And second, our perspective is different from that of a bankruptcy court considering a *claim* for priority or otherwise during the proceedings, for while an employee's ability to satisfy the eligibility provisions may

be speculative at that time, in this case it could be seen as a matter of fact when considering *dischargeability*. From this perspective we know that every employee seeking his vacation wages has complied with the 1000 hour provision.

Since it has been shown that the eligibility provision was satisfied, we think that a portion of vacation wages fairly attributable to work completed during the three month period preceding the arrangement proceedings is entitled to nondischargeable status. In fact, the real significance of the *Sampsell* case lies in its prorating vacation pay to appropriate segments of the work year. There, the employees had completed the required year of work within the three months prior to bankruptcy. The referee had allowed a wage priority claim under Section 64(a) (2) for only three-months' worth of vacation pay, and the district court affirmed. The union appealed, arguing that the condition precedent to vacation benefits was the completion of one year's work; that this condition had been met within the three month period; that the entire amount accrued at that moment; and that therefore all vacation compensation was entitled to priority. The court rejected the union's claim, stating in effect that the vacation was earned throughout the year, only one-fourth of which was completed within the three month priority period. Such apportionment corresponds with the reasoning of this court in the *Public Ledger* case [43] and is an economically accurate picture of the earning of vacation compensation.[44]

---

42. See generally, Note, Allocation of Vacation Pay to the Wage Priority Provision of the Bankruptcy Act, 106 U.Pa.L. Rev. 463 (1958).

43. In *Public Ledger* we concluded on the basis of the labor contract that all employees received vacation pay at the rate of one vacation day for each twenty-six working days. Using this formula, we assigned an appropriately allocable share of vacation compensation to the administrative expense and wage claim priorities of Section 64(a) of the Bankruptcy

Act, 11 U.S.C. § 104(a). In this case the number of vacation days accruing to each employee is graduated in accordance with his seniority, see note 4, supra, where the sections of the employment contract are reproduced, and the number of regular work units which earn one vacation unit can be similarly computed.

44. Accord, as to prorating, United States v. Munro-Van Helms Co., 243 F.2d 10, 13 (5 Cir. 1957): "'Wages' are compensation for personal services rendered by

We therefore hold that the order of confirmation is no bar to the recovery by the Union of vacation benefits appropriately allocable to the three month period preceding the arrangement proceedings. However any amount attributable to the three days beyond the three month period is discharged, since not within the exemption of Section 17(a)(5).[45]

### B. Period During Arrangement Proceedings

In re Public Ledger, supra, holds that when a business is run under an existing labor contract by a trustee or receiver, vacation compensation allocable to this period is entitled to treatment as an administrative expense.[46] The District Court held that while the Union would have been entitled to this amount had it made claim in the proceedings, it was barred by Section 355 of Chapter XI,[47] making Section 57(n) of the Bankruptcy Act,[48] applicable to arrangement proceedings. Section 57(n) states that "Claims which are not filed within six months after the first date set for the first meeting of creditors shall not be allowed." But an administrative expense is not a "claim" within the meaning of this section and the "six month" bar does not apply.[49]

Rather, the hindrance to the Union's recovery is that the receiver and the debtor are not identical legal personalities, and any vacation wages attributable to this period would have been owing from the receiver, not from the debtor. The appellant argues that this difficulty is avoided since Koven's Plan of Arrangement, approved by the Referee, states that "The Debtors will pay all priority claims and administration expenses in cash upon the confirmation of this Plan of Arrangement or upon such terms and conditions and with such security and on such deferred payments as will be agreed upon between this class of creditors and the Debtors." Furthermore, it notes that the order of confirmation required Koven to deposit additional funds as necessary to meet administration expenses. Thus the appellant argues that this was an exception to dischargeability "as provided in the arrangement or order confirming the arrangement" under Section 371 of Chapter XI.[50]

This argument misconceives Koven's obligation under the approved arrangement. After the filing of a Chapter XI petition, the possession and control of the business enterprise is that of the court. The receiver's power to operate the business of the debtor is under Section 343 [51] "subject to the control of the court," and similarly the distribution of moneys and consideration deposited

---

employees and are 'earned' when the service is rendered even though not then payable."

45. Such a wage claim for time preceding the three month period is discharged because it is a "provable", debt founded upon "a contract, express or implied," 11 U.S.C. § 103(a)(4), which is discharged by Section 17 of the Bankruptcy Act, made applicable in Chapter XI proceedings by 11 U.S.C. § 771. The dictum from the *Sampsell* case, supra in text, does not suggest that a vacation claim is not "provable" where the eligibility provision is unfulfilled, but rather that there is no debt existing—quite a different matter. See Lesser v. Gray, 236 U.S. 70, 35 S.Ct. 227, 59 L.Ed. 471 (1914). Whether the debt may have been "deemed" not "provable" under 11 U.S.C. § 103(d) because disallowed as contingent and unmanageable under 11 U.S.C. § 93

(d) is not a question open now, since it requires a specific adjudication of the bankruptcy court. See 9 Collier, Bankruptcy § 7.10[1] (14th ed. 1964).

46. 161 F.2d at 768.

47. 11 U.S.C. § 755.

48. 11 U.S.C. § 93(n).

49. In re Paramount-Publix Corp., 10 F. Supp. 504 (S.D.N.Y.1934); In re Green, 231 F. 253 (E.D.Pa.1916); see 2 Remington, Bankruptcy, § 882 (5th ed. 1956). Indeed, section 57(n) could not reasonably apply to administration expenses since some might not have even been incurred by the estate until after the six month period had run, depending upon the length of the administrative period.

50. 11 U.S.C. § 771.

51. 11 U.S.C. § 743.

by the debtor is under Section 337(1) of the Act[52] "subject to the control of the court." Such matters of administration are within the exclusive jurisdiction of the bankruptcy court and subject to summary adjudication under Section 2 of the Bankruptcy Act.[53] The bankruptcy court thus had the exclusive right and duty under its basic custodial power to decide what were proper administration expenses and to shield the estate from unnecessary and improvident expenditures.[54] Until any expense was allowed by the bankruptcy court as an administrative expense, Koven had no obligation to pay it.[55]

■ The record does not show that the Union ever made demand for this amount against the receiver or ever sought recovery in the bankruptcy court. Instead, during the time that other claimants were presenting their demands to the bankruptcy court, which had retained jurisdiction to oversee the payment of claims and costs, it sought to collect directly from Koven in an arbitral forum. To accept the Union's argument here would be to permit parties to litigate the amount and propriety of administrative expenses in a forum outside the bankruptcy court at the option of the claimant. This procedure is inconsistent with the custodial jurisdiction of the court. We therefore hold that the portion of vacation compensation allocable to the adminstration period may not be the subject of arbitration between Koven and the Union.

### C. Period Following Order of Confirmation

■ We think it clear that the arrangement proceeding did not discharge any debt incurred by Koven after the order of confirmation was entered and after it had been revested with its property under the terms thereof.

### IV—Conclusion

The proper formula for allocating the vacation pay is a matter of contract involving Article V of the Agreement prescribing the normal work schedule, Article XVI dealing with vacation pay, and other facts of the employment relationship which may be pertinent. As such, it is a matter within the expertise of a labor arbitrator,[56] and we have confidence that he can reach a fair solution, should he conclude, in light of the release, that a sum is owing.

The order of the United States District Court for the District of New Jersey of March 15, 1966 granting judgment in favor of Koven will be affirmed in such part as reflects the holding that the claim of the Union on behalf of certain of its members for vacation pay benefits from September 4, 1963 to January 10, 1964—the period of the administration of Koven under Chapter XI of the Bankruptcy Act—is not arbitrable. The said order will be reversed in such part as restrains and enjoins the Union from submitting to arbitration the remainder of the grievance, including the question of whether the general release from the Union to Koven and its Receiver, dated May 18, 1964, included in its coverage the claims for vacation pay benefits during the three month period prior to the commencement of the Chapter XI proceedings on September 4, 1966, and for the period following the entry of the order confirming the plan of arrangement—January 11, 1966 to the date of

---

52. 11 U.S.C. § 737(1).

53. 11 U.S.C. § 11.

54. See generally 9 Remington, Bankruptcy, §§ 3601–3604 (6th ed. 1955); 8 Collier, Bankruptcy, § 6.35 et seq. (14th ed. 1966).

55. The sense of this is clear from the text of the order of confirmation requiring that "Debtor shall, upon demand of the receiver, deposit such additional sums as may be required to add to the deposit heretofore provided for, for the purpose of satisfying such claims as may be made against the receiver, his administration expenses. * * *" Any objection by Koven to such a demand would have been presented to the referee in bankruptcy and adjudicated by him.

56. Great Falls Mill and Smelterman's Union No. 16 of the Int'l Union of Mine, Mill and Smelter Workers v. Anaconda Co., 260 F.Supp. 445, 448 (D.Mont. 1966).

the last work performed for Koven— February 28, 1966. The amounts of such vacation pay benefits, if any, are to be determined by the arbitrator in the event that the release is found not to include such claims. To such end the case will be remanded to the United States District Court for the District of New Jersey for such proceedings as may be consistent with this opinion.